FILED
2020 Jun-17  PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **DUKES CLOTHING, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | _____ |
| **THE CINCINNATI INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | | |

## COMPLAINT

## I
## PARTIES

1. Plaintiff, **DUKES CLOTHING, LLC**, is an Alabama limited liability corporation authorized to and doing business in the state of Alabama at all times material to the Complaint. Hereinafter, Dukes Clothing, LLC, d/b/a Dukes will be referred to as "Dukes."

2. Defendant, **THE CINCINNATI INSURANCE COMPANY**, is a foreign insurance corporation doing business in the state of Alabama at all times

1

material to the Complaint. Hereinafter, The Cincinnati Insurance Company, will be referred to as "Cincinnati Insurance."

## II

## JURISDICTION AND VENUE

3.     This Court has jurisdiction of this matter based upon 28 U.S.C. § 1332, in that there is complete diversity and Defendant Cincinnati Insurance is liable to Plaintiff Dukes in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interests and costs.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) and (c).

## FACTUAL BACKGROUND

5.     Plaintiff Dukes has two locations in Alabama. Dukes opened its first location at 914 Queen City Avenue., Tuscaloosa, Alabama 35401. Dukes opened its second location at 53 Church Street, Mountain Brook, Alabama, 35213.

6.     Defendant Cincinnati Insurance insured Plaintiff Dukes for both of the aforementioned locations. The policy period of the at-issue policy is September 10, 2018- September 10, 2021. The subject policy provides for Business Income coverage for both insured locations.

2

7.      As a result of COVID - 19, civil authority declarations from the State of Alabama and a direct exposure of COVID – 19 from a customer, Plaintiff Dukes was forced to close both of its insured locations.

8.      Plaintiff Dukes made a timely claim for loss of business income coverage against the policy of insurance issued by Defendant Cincinnati Insurance. The claim was made on April 20, 2020.

9.      Defendant Cincinnati Insurance denied the claim by letter on April 29, 2020. The claim was denied based on Cincinnati Insurance's determination that:

     a.      There was no direct physical loss to the covered property.

     b.      The policy contains a "pollution exclusion" and it has been determined the Coronavirus is a solid irritant or thermal contaminant.

**SARS 2003 (SARS-CoV)**

10.      Severe acute respiratory syndrome (SARS) was a viral respiratory illness caused by a coronavirus, SARS-CoV, first reported in Asia in February 2003. Over the next few months, the illness spread to more than two dozen countries in North America, South America, Europe, and Asia before the outbreak was contained.  By July 2003, a total of 8,098 probable SARS cases were reported

to the World Health Organization (WHO) from 29 countries, including only 29 specific cases from the United States. No deaths were reported in the United States, and there have been no known cases of SARS reported since 2004. [1]

11.   Comparing SARS to COVID-19 (SARS-CoV-2), BioSpace, a comprehensive life science industry news and information source, stated, "With SARS, most human-to-human infections occurred in health care settings that lacked robust infection control procedures. When infection control practices were implemented, the outbreak ended. Since then, the only occurrences have occurred through laboratory accidents. **They have not spread throughout the community** (emphasis added to the same)." [2]

12.   In May 2003, during the SARS outbreak, the Department of Epidemiology in the School of Public Health at the University of California Los Angeles (UCLA), made reference to, "The leading theory for the Amoy Gardens outbreak (Amoy Gardens was a housing estate and center of the outbreak) in Hong Kong focused on sewage backups into apartment toilets, where the virus may have become aerosolized," resulting in **fecal rather than community spread** (emphasis

---

[1]

Centers for Disease Control and Prevention (CDC), "Severe Acute Respiratory Syndrome (SARS), 2003.

[2]

BioSpace (BioSpace.com) is a comprehensive life science industry news and information source, providing "opportunities and tools to connect the innovative organizations and talented professionals who advance health and quality of life across the globe."

4

added to same)." [3] (The CDC has not confirmed any report of COVID-19 spreading from feces to a person: "This risk is low based on data from previous outbreaks of diseases caused by related coronaviruses, such as severe acute respiratory syndrome [SARS].")

13.     With respect to transmission or spreading of SARS, The New England Journal of Medicine stated, "SARS has been transmitted primarily, but not exclusively, in health care and hospital settings, generally five or more days after the onset of disease and from patients who were severely ill. These observations correlate with the finding that the peak viral load is reached around the 10th day of illness. There has been no reported instance of transmission before the onset of symptoms of disease. **Transmission to casual and social contacts is uncommon**, but transmission has occurred occasionally after close contact with a patient with SARS in the workplace, on an airplane, or in a taxi (emphasis added to same)." [4]

**CF 2006-OVBEF – ALABAMA**
**Amendatory Endorsement – Exclusion**
**of Loss Due to Virus or Bacteria**

---

[3]

Centers for Disease Control and Prevention (CDC), "Coronavirus 2019 (COVID-19) > Health Departments," 2019.

[4]

New England Journal of Medicine, "The Severe Acute Respiratory Syndrome," 2003: 349:2431-41.

14.     As to insurance claims arising from the SARS outbreak, the conventional wisdom is that insurers lost hundreds of millions of dollars in an onslaught of commercial property claims, including time element claims such as business interruption coverage. [5] Factually, the opposite seems more likely true. For example, The Wall Street Journal reported, "SARS doesn't seem to be having an impact on the 'business interruption' piece of standard commercial insurance policies." Claims Journal wrote, "In the insurance industry, possible travel and medical insurance claims generated by SARS are likely to be limited, while business interruption risk caused by the illness is not likely to be covered by most existing policies. Insurance claims generated by SARS, including life insurance claims, are likely to have only a limited financial impact on insurance companies in the region." [6]

---

[5]

At this point in time, Plaintiff does not have access to internal reviews or analytics gathered and produced by the ISO (Insurance Services Office) that may indicate or tend to indicate loss metrics on a widespread basis. While there may have been a notable impact on event cancellation and travel insurance, no such impact on commercial property or general liability insurance is evidenced from any source available to the general public.

One linkage to potential commercial property coverage was made in a white paper released by brokers Aon 2003. It contended that SARS-like epidemics could theoretically be insured under an "environmental impairment policy" as the viral agent would qualify as "an irritant or **contaminant**" under a typical pollution definition.

[6]

Claims Journal, "S&P's Says SARS Could Damage Health of Emerging Asian Companies," April 2003. The Wall Street Journal, "Insurers Exclude SARS Coverage in Policies for Event Cancellation," April 2003.

15.     Nonetheless, in 2006, the ISO (Insurance Services Office) drafted a new endorsement to address the exclusion of insured loss due to virus or bacteria (as discussed more fully in paragraphs below, the ISO provides policy forms to insurance companies and is universally accepted as the industry's drafter).   As background to the proposed endorsement, ISO stated, "Commercial Property policies currently contain a pollution exclusion that encompasses **contaminatio**n (in fact, uses the term **contaminant** in addition to other terminology). Although the pollution exclusion addresses **contamination** broadly, viral and bacterial **contamination** are specific types that appear to warrant particular attention at this point in time (emphasis added to same)."

16.     At the "point in time" referenced by the ISO, the only disease outbreak widely alerted by the WHO was H5N1 Avian influenza. Multiple cases and deaths were reported in other countries, but there were no reported cases in the United States. The WHO observed, "Almost all cases of H5N1 infection in people have been associated with close contact with infected live or dead birds, or H5N1 **contaminated environments**. The virus does not infect humans easily, and **spread from person to person appears to be unusual** (emphasis added to same)."   [7]

---

[7]

The WHO declared a pandemic related to the H1N1 Influenza A, commonly known as "swine flu" in 2009. In early October of that year, the CDC announced that swine flu was widespread across the country. Scientists developed a vaccine to protect

17.    The ISO is not an insurance company. Its website states, "ISO provides advisory services and information to many insurance companies. On your [the insured's or customer's] insurance policies, you may see notices showing ISO as the copyright owner. That's because ISO develops and publishes policy language that many insurance companies use as the basis for their products. But your policy is a contract between you and your company. ISO is not a party to that contract."

18.    Consequently, although ISO drafts and files forms for approval with the Alabama Department of Insurance (ADOI) as it does with regulators across the country, each insurance company delivering a policy contract in Alabama, or submitting a coverage restriction within the policy, must file the same with ADOI. "All rates and form filings for the commercial lines of property and casualty insurance . . . shall be according to the File and Use System." [8]

19.    ISO amendatory endorsement CF 2006-OVBEF was received by the ADOI on July 6, 2006. Its "disposition" on July 18, 2006, was described as "filed," with an effective date of January 1, 2007. In agreement with both the filing form and the National Association of Insurance Commissioners (NAIC) "Product Filing

---

humans from H1N1 after the 2009 outbreak. Since then, protection against H1N1 has become part of the regular seasonal flu shot.

[8]

Rates and Forms Filing Requirements for Property and Casualty Insurance, Chapter 482-1-123 (2001), et seq.

Review Handbook," ISO identified a need for the endorsement but did not develop underwriting rules to guide an insurer in deciding whom to accept as a policyholder and whether other coverage limitations were required.

20.    ISO penned the following "Introduction" to the amendment:

> "The current pollution exclusion in property policies encompasses **contamination** (in fact, uses the term **contaminant** in addition to other terminology) [emphasis added to same]. Although the pollution exclusion addresses **contamination** broadly, viral and bacterial **contamination** are specific types that appear to warrant particular attention at this point in time.

> "An example of bacterial **contamination** of a product is the growth of listeria bacteria in milk. In this example, bacteria develop and multiply due in part to inherent qualities in the property itself. Some other examples of **viral and bacterial contaminants** are rotavirus, SARS, influenza (such as avian flu), legionella and anthrax. The universe of disease-causing organisms is always in evolution (emphasis added to same).

> "Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property.

When disease-causing viral or bacterial **contamination** occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of **decontamination** (for example, interior building surfaces), and business interruption (time element) losses (emphasis added to same)." [9]

21.     The following "Current Concerns" were expressed by the ISO:

"Although building and personal property could arguably become **contaminated** (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case. In addition, pollution exclusions are at times narrowly applied by certain courts. In recent years, ISO has filed exclusions to address specific exposures relating to **contaminating or harmful substances**. Examples are the mold exclusion in property and liability policies and the liability exclusion addressing silica dust. Such exclusions enable elaboration of the specific

---

[9]

Common definitions: "contamination" is the action or state of making or being made impure by polluting or poisoning; "contaminant" is something that contaminates a substance such as water or food; "viral or bacterial contamination " is "biological contamination" which, in turn, is bacterial, fungal, or viral; and a "substance" is a particular kind of matter with uniform properties.

exposure and thereby can reduce the likelihood of claim disputes and litigation (emphasis added to same).

"While property policies have not been a source of recovery for losses involving **contamination** by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent (emphasis added to same)." [10]

### COVID-19 (SARS-CoV-2)

22.     COVID-19 was first detected in Wuhan City, Hubei Province, China. Although the first infections were linked to a live animal market, it continued spreading from person to person contact. The agent that causes COVID-19 spreads easily and sustainably in the community (**community spread**), a term was first used in 1945. Merriam-Webster Dictionary defines the term as "the spread of a

---

[10]

In its filing review handbook, NAIC describes the analysis phase of drafting an insurance product thusly: "This phase involves identification of risk faced by individuals, families and businesses. Once risks have been identified, appropriate treatment of the risk is needed. Treatment of risk may be accomplished in a number of ways, such as through risk financing transfers (e.g., insurance) and non-insurance risk financing transfers (e.g., hold harmless agreements). However, this text will focus on the development of insurance products to meet the nation's financial risk transfer needs. The product development staff must assess whether its prototype is an appropriate risk transfer device and figure out whether the product being contemplated is marketable. Analysis may also involve modeling." ISO did not draft such an analysis in the CF 2006-OVBEF submission.

contagious disease to individuals in a particular geographic location who have no known contact with other infected individuals or who have not recently traveled to an area where the disease has any documented cases."

23.     While researchers have been trying to determine whether the COVID-19 agent can travel through the air, it is undisputed that evidence pointing to airborne transmission — in which the disease spreads in the much smaller particles from exhaled air, known as aerosols — is occurring, and precautions (**social distancing**) have been recommended to reduce the risk of infection. [11]

24.     Social distancing, also known as **physical distancing**, is a set of non-pharmaceutical interventions or measures taken to prevent the spread of a contagious disease by maintaining a physical distance between individuals and among people and reducing the number of times people come into close contact with each other. In this respect, social distancing typically involves keeping a certain distance from others and avoiding gathering together in large groups. To practice social or physical distancing, the CDC recommends an individual "Stay at

---

[11] See, generally, *coronavirus.gov* and the Centers for Disease Control and Prevention (CDC). Research supported by the Intramural Research Program of the National Institute of Allergy and Infectious Diseases, National Institutes of Health, published in the New England Journal of Medicine on March 17, 2020, affirmatively indicates that aerosol and fomite (materials that are likely to carry infection such as clothes and furniture, for example) transmission of COVID-19 is credible, since the virus can remain viable and infectious in aerosols for hours and on surfaces up to days. (Sourced from the New England Journal of Medicine on date indicated.)

least 6 feet (about 2 arms' length) from other people," "Do not gather in groups," and "Stay out of crowded places and avoid mass gatherings." [12]

25.     By reducing the probability that a given uninfected person will come into physical contact with an infected person, the disease transmission can be suppressed, resulting in fewer deaths. The measures are used in combination with good respiratory hygiene and hand washing by a population. To slow down the spread of infectious diseases and avoid overburdening healthcare systems, social distancing measures include the closing of schools, workplaces, and the cancellation of large gatherings. It is undisputed that governments across the globe imposed strict limitations and lockdowns on businesses and all forms of societal functions and interactions deemed non-essential. [13]

**Insurance Industry Response to COVID-19**

26.     The insurance industry has broadly and uniformly taken one of two positions in response to property damage, civil authority, and time element

---

[12]

Answering the question, "Why practice social distancing," the CDC stated, "COVID-19 spreads mainly among people who are in close contact (within about 6 feet) for a prolonged period. Spread happens when an infected person coughs, sneezes, or talks, and droplets from their mouth or nose are launched into the air and land in the mouths or noses of people nearby. The droplets can also be inhaled into the lungs."

[13]

Social-distancing measures actually date back to at least the fifth century BC. The Bible contains one of the earliest known references to the practice in the Book of Leviticus 13:46: "And the leper in whom the plague is . . . he shall dwell alone; [outside] the camp shall his habitation be."

(business interruption) claims under commercial property policies: (a) the comprehensive denial of claims based upon the predetermined conclusion that COVID-19 is not and cannot be the cause, concurrent or otherwise, of any category of property damage; and (b) even if the conclusion is that that COVID-19 does and can cause property damage, the resulting loss is excluded from coverage by virtue of the ISO exclusion either written into policy language by an individual company or adopted in its entirety.

27.     It is not a manipulation of the plain wording of the ISO's amendment to concede, and even agree, that viral **contamination** is property damage and that CF 2006-OVBEF considered no other alternative and used no other descriptive language. The amendment does use the word "arguably" in an attempt to qualify what appears otherwise to be a definitive conclusion with respect to the issue. But common and widely accepted rules of construction mandate that ambiguity in any insurance policy be resolved in favor of the insured. The same rule applies equally to the word "arguably" which by its own definition describes something that can be asserted or shown to be a certain way. In other words, ambiguity. In the case of a tie – even an arguable tie – between insured and insurer on a coverage decision, the tie goes to the insured.

28.    At the time CF 2006-OVBEF was drafted in 2006, it made illustrative reference to the following: rotavirus, SARS, influenza (citing avian flu in particular), legionella, and anthrax (see paragraph 14 herein). Of these references, all are spread through physical **contamination**.[14]   In consequence, ISO itself demonstrates that CF 2006-OVBEF is directed to the exclusion of physical property damage caused by **physical contamination** of the same.

29.    CF 2006-OVBEF is clearly the result and culmination of the insurance industry's intention to rid itself of any coverage liability for **physical contamination** causing damage to property. Hence, insurers, including the defendant insurer in this Complaint, recognized that if real property is **contaminated**, or a threat of **physical contamination** exists, and the same is quarantined or otherwise rendered in accessible either voluntarily or by government order, coverage liability would exist in a wide range of commercial property policies for losses including business interruption, the cost of remediation, and other benefits owed to the insured.

---

14

Rotaviruses, the most common cause of diarrheal disease, are transmitted by the fecal-oral route, via contact with contaminated hands, surfaces, and objects. SARS, as we have noted, is transmittable by contact with contaminated feces (see paragraphs six and seven herein). Avian influenza is spread by and through contaminated environments (see paragraph 10 herein). Anthrax is caused by spore-forming bacterium mainly affecting animals. And legionella is a naturally occurring bacterium found in freshwater environments that can become a health concern when it grows and spreads in building water systems. (Remediation of a legionella outbreak usually results in a building closure, causing substantial business interruption. A 2009 outbreak at Miami's EPIC Hotel, for instance, reportedly caused daily income losses of about $200,000.00.)

30.    Therefore, any assertion that COVID-19 is not and cannot be a causative agent of property damage is patently wrong (not to mention disingenuous and duplicitous). Any policy form addressing a bacterial or viral exclusion, including but not limited to the CF 2006-OVBEF amendment, by its own wording **must concede** that a viral agent can cause property damage demonstrated by the repetitive usage of and reference to the word **contamination**. The ISO, in its introduction to CF 2006-OVBEF and expression of current concerns, fully accepted that a virus can cause **physical contamination** of building and personal property.

31.    This, however, has not stopped the insurance industry, when faced with a commercial property policy that does not include language concerning a viral exclusion (including but not limited to CF 2006-OVBEF), from collectively and loudly denying the very thing that it conceded in 2006: that bacterial or viral **contamination is property damage**, because as contaminants they render a physical object unusable until remediation or replacement. [15]

**"All-Risks" Insurance**

---

[15]

The dizzying height of the industry's hypocrisy can be measured in its interpretations of policy forms. For example, Owners Insurance has denied in other cases that COVID-19 is a causative agent of property damage; in this case, it accepts that it is within the definition of covered loss, but coverage is rejected by application of the virus exclusion.

32.     The contract of insurance at issue is referred to as an "All-Risks" policy. When a property insurance policy, including that between Plaintiff Dukes and Defendant Cincinnati Insurance, is written on an all-risk basis (with or without the word "all"), the insured only has the burden to show (a) the existence of the policy and (b) a loss to covered property. The insured is not required to establish the cause of loss. The burden of proof as to causation shifts to the insurer, even though the policy may not say so.

33.     An insurer cannot simply rely on one or more exclusions as the basis for denying an "all-risks" property loss. The insurer must show that the loss was **proximately caused by the excluded peril**:

> "This places an especially heavy burden on the insurer because the contract of adhesion doctrine suggests that exclusions in the policy usually will be given the interpretation most favorable to the insured. To sustain the burden of proof, it is not enough for the insurer merely to offer one reasonable interpretation under which the loss is excluded." [16]

---

[16]

Insurance Contract Analysis, "External Factors Affecting Insurance Policy Analysis," "Burden of Proof," Eric A. Wiening and Donald S. Malecki, (1992)

## COUNT I

## (BREACH OF CONTRACT)

34.     Plaintiff Dukes incorporates all of the preceding paragraphs as if specifically outlined herein.

35.     Insurance policy ECP  040 34 96 is a legal contract between Plaintiff Dukes and Defendant Cincinnati Insurance.

36.     The policy provides coverage for business interruption at both Dukes' locations in Alabama (Tuscaloosa and Mountain Brook).

37.     The policy is an "All-Risk" policy.

38.     The policy does not contain a virus or bacteria exclusion, even though Defendant Cincinnati Insurance does have virus and bacteria exclusions in other policies.  Moreover, "thermal contamination" as an exclusion is in no way applicable, definitionally or otherwise, to the facts of the claim or the risk of direct physical contamination.

39.     Plaintiff Dukes provided timely notice of the business interruption claim to Defendant Cincinnati Insurance.

40.     Plaintiff Dukes established the business interruption loss at both insured locations was the result of COVID-19, civil authority orders and a customer COVID-19 exposure.

41.    Defendant Cincinnati Insurance breached the contract by denying Plaintiff Dukes' business interruption claim.

42.    As a direct and proximate result of this breach, Plaintiff Dukes has been injured.

**WHEREFORE THESE PREMISES CONSIDERED,** Plaintiff Dukes demands judgment against Defendant Cincinnati Insurance for all available damages in an amount to be determined by a jury.

## COUNT II

## (BAD FAITH)

43.    Plaintiff Dukes incorporates all of the preceding paragraphs as if specifically outlined herein.

44.    Defendant Cincinnati Insurance denied Plaintiff Dukes' insurance claim in bad faith.

45.    Defendant Cincinnati Insurance denied the business interruption claim in bad faith by deciding to deny such a claim before Plaintiff Dukes ever submitted it, by attempting to create its own debatable reason for denying the claim (relying on a property damage requirement that is inherently met with COVID-19 and by trying to create a virus or bacteria exclusion when one is not contained in the policy), by shifting the burden of an "All-Risk" claim  to Plaintiff Dukes, by not

19

marshaling all the necessary facts concerning the claim, and by not subjecting the claim decision to a cognitive review.

46.     As a direct and proximate result of this bad faith, Plaintiff Dukes has been injured.

**WHEREFORE THESE PREMISES CONSIDERED,** Plaintiff Dukes demands judgment against Defendant Cincinnati Insurance for all available damages in an amount to be determined by a jury.

## COUNT III
## INSTITUTIONAL BAD FAITH

47.     Plaintiff Dukes incorporates all of the preceding paragraphs as if specifically outlined herein.

48.     Defendant denied Plaintiff's claim for insurance coverage.

49.     Based upon its conduct in this case, Defendant adopted a general business practice to deny insurance claims arising from the COVID-19 pandemic and is employing strategies to deprive policyholders, including but not limited to the Plaintiff, the benefits of their insurance contracts.

50.     Based upon its conduct in this case, Defendant has intentionally disregarded its own programs or procedures for handling claims, and its handling

of the Plaintiff's insurance claim is in conformity with a deliberate business practice to deny claims arising from the COVID-19 pandemic.

51. Based upon its conduct in this case, Defendant has committed a series of wrongful separate and discrete acts, orally and in writing, illustrating its new business practice to deny claims arising from the COVID-19 pandemic without regard for accepted industry standards for claim investigation.

52. Based upon its conduct in this case, Defendant has directed its claim adjusters both in Alabama and nationwide, to deny claims arising from the COVID-19 pandemic without regard for accepted industry standards for claim investigations and in a manner inconsistent with ethical responsibilities to their insureds.

53. Based upon its conduct in this case, Defendant has acted in bad faith on an institutional level thereby creating a causal connection between its conduct and Plaintiff's damages and the damages of hundreds of insureds in a position same or similar to the Plaintiff in this case.

**WHEREFORE THESE PREMISES CONSIDERED,** Plaintiff Dukes demands judgment against Defendant Cincinnati Insurance for all available damages in an amount to be determined by a jury.

## COUNT IV
## NEGLIGENCE/WANTONNESS

54.    Plaintiff Dukes incorporates all of the preceding paragraphs as if specifically outlined herein.

55.    Defendant denied Plaintiff's claim for insurance coverage.

56.    Defendant had a duty to properly and reasonably investigate and adjust

Plaintiff's insurance claim.

57.    Defendant negligently failed to investigate or adjust Plaintiff's insurance

claim.

58.    Defendant intentionally failed to investigate or adjust Plaintiff's insurance

claim.

59.    As a direct and proximate result of Defendant's negligence and wantonness, Plaintiff has been damaged.

**WHEREFORE THESE PREMISES CONSIDERED,** Plaintiff Dukes demands judgment against Defendant Cincinnati Insurance for all available damages in an amount to be determined by a jury.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully submitted,

*/s/ R. Matt Glover* (asb-7828-a43g)
R. Matt Glover
Prince Glover Hayes
1 Cypress Point
701 Rice Mine Road North
Tuscaloosa, Alabama 35406
Phone: (205) 345-1234
Fax: (205) 752-6313
Email: mglover@princelaw.net

*/s/ Ted Colquett* (asb-4624-t58p)
Ted Colquett
COLQUETT LAW, LLC
Post Office Box 59834
2917 Central Avenue, Suite 305
Birmingham, Alabama 35259-0834
Phone: (205) 245-4370
Email: ted@colquettlaw.com

## DEFENDANT TO BE SERVED VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Cincinnati Insurance Company
c/o Scott Tyra
2001 Park Place North Ste. 200
Birmingham, Alabama 35203

23